**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRANCISCO VILLANUEVA,<br>Plaintiff,<br><br>– against –<br><br>PREMIER DEVELOPMENT ENTERPRISES INC., TRISTAR SHIELDING LLC, STUART GIL, ALLEN DALTON, and ABC COMPANIES 1–10 (names fictitious),<br>Defendants. | Case No. ____________<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Francisco Villanueva ("Villanueva"), by his attorneys Geoffrey Kalender, PC and The Law Offices of Jacob Aronauer, for his complaint against Defendants Premier Development Enterprises Inc. ("Premier"), Tristar Shielding LLC ("Tristar"), Stuart Gil ("Gil"), and Allen Dalton ("Dalton") (together, the "Employer Defendants"), and against ABC Companies 1–10 (the "General Contractor Defendants"), alleges as follows.

**NATURE OF THE ACTION**

1 In November 2025 a coworker sued Premier over the way it paid its workers. The day after Gil and the other owners received notice of that suit, Gil called Villanueva and another worker into the office, told them not to answer the phone if anyone called. When a hospital manager posted the prevailing wage schedules on the second floor of Kings County Hospital, Gil and the foreman tore them down.

2 Villanueva told Gil the coworker was owed the money and would win and asked what would happen to the rest of them. He said that if they were pushed aside, they would do what the coworker had done. The coworker's case settled in March 2026.

3 Villanueva is a carpenter. For twenty years Premier and Tristar sent him into New York City's public hospitals to build the rooms that hold MRI and PET/CT machines and to line the walls with lead. On that work the law set his wage at the prevailing rate for his trade. The Employer Defendants paid by cash stuffed envelope, at a flat daily rate that came to about a quarter of that required rate. Six weeks before Villanueva's employment ended, Gil handed out the pay envelopes with an extra $300 in each and told the workers the company would not work as it had anymore. This was never explained.

4 In late May 2026, Villanueva finished two weeks of work at the private home of Dalton, an owner of Premier and Tristar, and was told there were no more projects. He was told he would be called if anything came up and was paid his last week and the vacation week he was owed. He has not since been called.

5 This action seeks the prevailing wages and supplements Villanueva earned and was never paid, the overtime owed him under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (the "FLSA"), and the New York Labor Law (the "NYLL"), the sums deducted from his pay without written authorization, statutory damages for the wage notices and statements he never received in twenty years, damages for his retaliatory discharge, and his attorneys' fees and costs.

## JURISDICTION AND VENUE

6 This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), and supplemental jurisdiction over Villanueva's state law claims under 28 U.S.C. § 1367(a), because those claims arise from the same employment, pay practices, and projects as his federal claims.

7 Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to these claims occurred in this District, including work at NYC Health + Hospitals facilities in the Bronx, and because Defendants conduct business here.

8 At all relevant times the Employer Defendants operated an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(s)(1). The enterprise had two or more employees, including Villanueva, who regularly handled lead shielding, drywall, metal door and window frames, electrical components, and other building materials manufactured outside New York, and, on information and belief, it had an annual gross volume of sales made or business done of not less than $500,000.

9 In the alternative, Villanueva was individually engaged in commerce within the meaning of 29 U.S.C. § 207(a)(1), because he regularly handled and installed materials manufactured outside New York.

10 Villanueva's FLSA claims reach back three years because the violations were willful, 29 U.S.C. § 255(a); his NYLL claims reach back six years, NYLL §§ 198(3), 663(3); and his contract and quasi-contract claims reach back six years, CPLR 213(2). Earlier facts are pleaded as background and as evidence of knowledge and willfulness.

**PARTIES**

11 Villanueva resides in Spring Valley, New York. From approximately mid-2006 until approximately May 26, 2026, he was employed by the Employer Defendants as a carpenter, and he was their employee within the meaning of 29 U.S.C. § 203(e) and NYLL §§ 190(2), 651(5), and 220.

12 Premier is a New York business corporation, incorporated June 27, 2006, Department of State File Number 3381861, with its principal office at 27 Keswick Lane, Plainview, New York 11803, and a warehouse at 2481B Charles Court, North Bellmore, New York 11710. It performs construction for medical imaging installations and lead shielding, much of it on public works projects. Premier was Villanueva's employer within the meaning of 29 U.S.C. § 203(d) and the NYLL.

13 On information and belief, Tristar is a New York limited liability company with a registered address at 39-40 57th Street, Woodside, New York 11377. It installs lead-lined doors and windows in medical facilities. Tristar operates from Premier's North Bellmore warehouse, where Villanueva framed lead-lined doors and handled the lead stored there; its work was assigned, supervised, and paid for by the same people who assigned, supervised, and paid for Premier's work; and Villanueva performed its one-day installations approximately sixty of his workdays a year, paid in the same envelope at the same daily rate. Tristar was Villanueva's joint employer within the meaning of 29 U.S.C. § 203(d) and the NYLL.

14 Gil resides in New York and is an owner, officer, and operator of Premier and Tristar. Gil had the power to hire and fire Villanueva, set his pay and every raise, assigned his worksites, and controlled whatever records were kept. He was Villanueva's employer within the meaning of 29 U.S.C. § 203(d) and the NYLL and is individually liable for the violations alleged here.

15 Dalton resides in New York and is an owner of Premier and Tristar. With Gil, he founded Premier and hired Villanueva; he was frequently on Villanueva's worksites, and most

weeks handed him his pay envelope. He was Villanueva's employer within the meaning of 29 U.S.C. § 203(d) and the NYLL and is individually liable for the violations alleged here.

**16** ABC Companies 1–10 are the general contractors that held the prime contracts on the public works projects described below and engaged Premier or Tristar as subcontractors. Their identities are known to the Employer Defendants and the public agencies that let the contracts, and Villanueva will amend to name these agencies.

## FACTUAL ALLEGATIONS

### A. Villanueva was the Employer Defendants' employee, and they controlled everything about his work.

17 Before Premier existed, Villanueva worked with Gil and Dalton at a company he knew as "AMG." When AMG dissolved, Gil and Dalton formed Premier and recruited Villanueva and other AMG workers. Villanueva began at Premier in or about mid-2006, at $150 per day in cash, and worked for the Employer Defendants continuously for twenty years, including through the COVID-19 pandemic.

18 His work was carpentry, painting, the construction of rooms for MRI, PET/CT, and other imaging equipment, lead shielding on walls, lead-lined door and window frames and doors, electrical work, and drop ceilings.

19 The Employer Defendants chose his projects and worksites, set his hours, set his rate of pay and decided when it changed, and supervised his work daily through their foreman, James Dalton, Allen Dalton's brother, who told him what to do and how to do it.

20 Villanueva had no business of his own. He never bid a project, contracted with a customer, hired a helper, or worked for anyone else in twenty years. His only investment was the safety equipment and basic hand tools he was told to buy himself, roughly $2,000 over

twenty years; the Employer Defendants supplied the materials, the specialized equipment, the vehicles, and the warehouse. He received one paid vacation week a year.

21 He never signed an employment agreement, an independent contractor agreement, or any other writing about his work, and the Employer Defendants never called him a subcontractor. When Villanueva and his coworker Carlos Hidalgo pressed Gil for raises, Gil told them that if they kept bothering him, he would hire subcontractors instead.

22 Throughout his employment, at the Employer Defendants' direction, Villanueva also worked for months at a time on houses Gil had bought, assigned, supervised, and paid the same way as any other project — the same daily rate in the same envelope.

23 Villanueva was economically dependent on the Employer Defendants for his livelihood, and by every measure of the relationship — who controlled the work, who supplied the equipment, whose business it was, and who bore the risk — he was their employee and not an independent contractor. New York's Construction Industry Fair Play Act, NYLL § 861 et seq., reflects the same policy, treating a person who performs construction services for a contractor as the contractor's employee unless the contractor shows that the person is free from its control, works outside its usual course of business, and is customarily engaged in an independently established business. None of those things is true of Villanueva.

24 The Employer Defendants nonetheless treated Villanueva, for every purpose that cost them money, as if he were not their employee. They did so willfully, to avoid the obligations that attach to an employee.

**B. Most of Villanueva's work was public work, and he was paid a quarter of the prevailing rate.**

25 Most of Villanueva's work was performed on public works projects at facilities of New York City Health + Hospitals ("H+H"), a public benefit corporation of the City of New York: NYC Health + Hospitals/Queens, including a PET/CT room; NYC Health + Hospitals/Kings County, including a medical imaging installation on the second floor; NYC Health + Hospitals/Elmhurst; NYC Health + Hospitals/Jacobi; NYC Health + Hospitals/Woodhull; and NYC Health + Hospitals/North Central Bronx (the "Public Works Projects"). He usually worked on more than one at a time, and in 2026 on at least four at once. He retains the hospital access card issued to him at each facility.

26 Each Public Works Project was performed under a contract let by a public agency for public work, on which Article I, § 17 of the New York Constitution and NYLL § 220 required the payment of prevailing wages and supplements to every laborer, worker, and mechanic. Villanueva was a laborer, worker, and mechanic on each, in the trade of carpenter.

27 The applicable prevailing wage and supplemental-benefit rate for a Building Commercial Carpenter performing public work in New York City was $100.88 per hour from July 1, 2020 through June 30, 2021; $101.88 per hour from July 1, 2021 through June 30, 2022; $102.88 per hour from July 1, 2022 through June 30, 2023; $102.93 per hour from July 1, 2023 through June 30, 2024; $105.38 per hour from July 1, 2024 through June 30, 2025; $108.13 per hour from July 1, 2025 through June 30, 2026; and $110.88 per hour beginning July 1, 2026. These rates include both the applicable prevailing hourly wage and required supplemental benefits. The Employer Defendants paid Villanueva a flat daily rate that came to between $22.50 and $25.00 per hour over an eight-hour day and provided no

supplemental benefits. On information and belief, the Employer Defendants billed the General Contractor Defendants and the public agencies for Villanueva's labor at the applicable prevailing wage and supplemental-benefit rates and retained the difference.

28 NYLL § 220(3-a)(a) required the Employer Defendants to post the prevailing wage schedules at each Public Works Project. They did not.

**C. Villanueva was paid a flat daily rate in cash, with no record of his hours and no pay documents of any kind.**

29 Villanueva's daily rate was $150 in 2006. It rose to $160, then to $180, where it stayed from 2020 through 2024. In 2025 it rose to $200, where it stayed until approximately six weeks before the end of his employment, when the Employer Defendants added $300 per week, as described in Part E.

30 He was paid on Fridays in a five-day week and on Saturdays in a six-day week, in cash, in an envelope. Until 2025 the envelope was marked with the pay period, the days worked, and the amount; Villanueva kept many of them. There was no time clock, no sign-in sheet, no receipt, and no signature. He was never given a pay stub, a wage statement, a wage notice at hiring or at any raise, a W-2, a 1099, or any other tax document, and nothing was withheld or contributed for taxes, Social Security, unemployment insurance, workers' compensation, or disability.

31 When Villanueva asked Gil for the documents he needed to file his income taxes, Gil told him it was too complicated and to file on his own. Left to reconstruct twenty years of cash income with no employer record, Villanueva was unable to document his income accurately for tax purposes.

32 Villanueva worked five days a week, and six when the Employer Defendants required it — at least one Saturday a month, and approximately six Saturdays between January and May 2026. A weekday ran from approximately 8:00 a.m. to 4:00 p.m.; a Saturday started at approximately 6:00 a.m., when the hospitals were closed to the public and loud work like cutting floors could be done, and was also an eight-hour day. On some days he received a meal break of approximately thirty minutes; on others he ate quickly and worked through it. No time was deducted from his pay either way.

33 In every six-day week Villanueva worked more than forty hours. The Employer Defendants paid the same flat daily rate for the sixth day as for every other and no overtime premium for any hour over forty. His regular rate in such a week was his weekly cash pay divided by his hours, 29 C.F.R. § 778.112 — at $200 a day, approximately $26 an hour — and he was owed an additional half of that rate for each hour over forty.

34 For the week of January 19 through 25, 2026, and the week of April 20 through 26, 2026, Villanueva worked six days and more than forty hours and was paid his flat daily rate with no overtime premium.

**D. The Employer Defendants deducted loan repayments, a vehicle, and medical appointments from his pay, with nothing in writing.**

35 In or about 2019 or 2020, Villanueva bought a vehicle that had belonged to the Employer Defendants, and they deducted the price from his wages in installments. He holds the title showing their prior ownership.

36 During the COVID-19 pandemic, Villanueva borrowed from the Employer Defendants to pay for his father's hospitalization, and they deducted approximately $200 from his wages every week until it was repaid. On other occasions over the years, he borrowed from Gil,

and each time the repayment was withheld from his pay: the envelope itself recorded the deduction, stating his pay "minus" the amount taken.

37 On two or three occasions, when Villanueva took part of a day for a medical appointment, the Employer Defendants docked his pay for the time; after that he took full days off rather than lose pay. He was never told of any right to be paid sick leave, never permitted to accrue it, and never paid for it. He worked more than eighty hours in each calendar year within the City of New York.

38 No deduction was ever authorized in writing. No loan agreement, repayment schedule, or authorization of any kind was prepared or signed.

**E. The Employer Defendants were sued for these practices, retaliated when Villanueva asserted his own rights and let him go.**

39 On November 4, 2025, Ramon Cuevas, a coworker who had done the same work on the same Public Works Projects, sued Premier, Tristar, Gil, and Dalton in this Court for unpaid prevailing wages, unpaid overtime, and related violations of the FLSA and the NYLL. *Cuevas v. Premier Development Enterprises Inc.*, No. 1:25-cv-09173 (S.D.N.Y.) (the "Cuevas Action"). The Cuevas Action was resolved and dismissed by order entered March 2, 2026.

40 Shortly after the filing, Cuevas told Villanueva about prevailing wages. It was the first time anyone had told him he was entitled to one, and the first time he understood he had been underpaid.

41 The day after the Employer Defendants received notice of the Cuevas Action, Gil called Villanueva and Carlos Hidalgo into the office.

42 Gil told them to look at what Ramon had done, that he had always been nice to them, and that it was not fair. He said the case would take a while and he did not think Cuevas would

win anything. Villanueva answered that Cuevas was owed money and would win and asked what about the rest of them — would they be left with nothing. Gil said he would give them something after the case was over, that it would take years, and that if anyone called, they should not pick up and if anyone asked they should say they were friends. Villanueva told Gil that if they were pushed aside, they would do the same thing Ramon did. Gil said it would not come to that.

43 After the filing, a manager at NYC Health + Hospitals/Kings County posted the prevailing wage schedules on the second floor, where Villanueva and his coworkers were working on an imaging installation. When Gil and James Dalton arrived and saw them, they tore them down. The manager later returned and asked what had happened to the schedules; the workers told him the managers had removed them.

44 Approximately six weeks before the end of his employment, Gil handed out the envelopes and told the workers they would receive an additional $300 a week. It was the only raise in twenty years the Employer Defendants had offered rather than been asked for. Gil told them to keep their money, because the company would not work as it had anymore. No envelope or record of any kind was provided for the $300 payments.

45 Around the same time, Gil told the workers that money isn't everything and that maybe it was time they went home to see their families, encouraging them to leave.

46 In the final two weeks of his employment, Villanueva and Hidalgo worked at Dalton's personal residence at the Employer Defendants' direction. Villanueva has photographs of the two of them there.

47 In or about late May 2026, the Employer Defendants told Villanueva and his coworkers that there were no more projects and no more work, and that they would be called if anything came up. They paid him for his final week and his vacation week. He has not been called.

48 The stated reason was false. The Employer Defendants had announced the wind-down six weeks earlier, had kept Villanueva working at an owner's own house through his last two weeks, and let him go after the Cuevas Action was resolved and before he could bring the claim he had told Gil he would bring.

49 The Employer Defendants' violations were willful. They paid in cash and kept no records for twenty years; they were sued for it and changed nothing; they tore prevailing wage schedules off a hospital wall; they told their workers not to answer the phone and to call the employment a friendship; and they threatened to replace those workers with the subcontractors they knew the workers were not.

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act — Unpaid Overtime, 29 U.S.C. § 207**
**(Against the Employer Defendants)**

50 Villanueva repeats and realleges every preceding paragraph.

51 Villanueva was an employee of each Employer Defendant within the meaning of 29 U.S.C. § 203(e)(1), and each was his employer within the meaning of 29 U.S.C. § 203(d).

52 The Employer Defendants failed to pay Villanueva one and one-half times his regular rate for each hour over forty in a workweek, in violation of 29 U.S.C. § 207(a)(1), and did so willfully within the meaning of 29 U.S.C. § 255(a).

53 Villanueva is entitled to his unpaid overtime, an equal amount as liquidated damages, and his reasonable attorneys' fees and costs under 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**New York Labor Law — Unpaid Overtime, NYLL § 650 et seq. and 12 NYCRR § 142-2.2**
**(Against the Employer Defendants)**

54 Villanueva repeats and realleges every preceding paragraph.

55 Villanueva was an employee of each Employer Defendant, and each was his employer, within the meaning of NYLL § 651. Under NYLL § 652 and 12 NYCRR § 142-2.2, they were required to pay him one and one-half times his regular rate for each hour over forty in a workweek, and they did not.

56 Villanueva is entitled to his unpaid overtime, liquidated damages of one hundred percent, prejudgment interest, and his reasonable attorneys' fees and costs under NYLL §§ 198(1-a) and 663.

**THIRD CAUSE OF ACTION**
**Breach of Contract — Prevailing Wages and Supplements on Public Works Contracts**
**(Against the Employer Defendants)**

57 Villanueva repeats and realleges every preceding paragraph.

58 By operation of Article I, § 17 of the New York Constitution and NYLL § 220(3)(a), every contract and subcontract for each Public Works Project contained a promise that each laborer, worker, and mechanic on the project would be paid not less than the prevailing rate of wages and supplements for his trade. That promise is made for the workers' benefit, and a covered worker may enforce it as a third-party beneficiary of the public works contract regardless of what the written contract says.

59 The Employer Defendants performed each Public Works Project as a contractor or subcontractor, and breached that promise by paying Villanueva a flat daily rate far below the prevailing rate for a carpenter and no supplements at all.

60 Villanueva is entitled to the difference between the prevailing wages and supplements he was owed and what he was paid for every hour on the Public Works Projects during the relevant period, with interest; and because those amounts are wages within the meaning of NYLL § 190(1), to liquidated damages of one hundred percent and his reasonable attorneys' fees and costs under NYLL § 198(1-a).

**FOURTH CAUSE OF ACTION**
**New York Labor Law — Unlawful Deductions from Wages, NYLL § 193**
**(Against the Employer Defendants)**

61 Villanueva repeats and realleges every preceding paragraph.

62 NYLL § 193(1) prohibits any deduction from wages except deductions required by law and deductions the employee has expressly authorized in writing, for his own benefit, within the categories the statute lists. Before an employer may recoup a wage advance by deduction, 12 NYCRR § 195-5.2 requires a written authorization, given before the advance is made, specifying the amount advanced, the total to be deducted, the amount of each deduction, and the dates the deductions will be taken; money given without such a writing is not an advance and may not be recovered through deductions from wages.

63 The Employer Defendants deducted from Villanueva's wages the price of a vehicle, the repayment of the COVID-19 loan at approximately $200 a week, and the repayment of the further loans Gil made him over the years, none of it authorized in writing in any form. Each loan repayment was taken directly out of his pay: the envelope itself stated his pay "minus" the amount withheld. The vehicle was a purchase, not an advance, and falls within no category the statute permits; and because no loan was ever the subject of a

written authorization, none was an advance the Employer Defendants could lawfully recoup.

64 Villanueva is entitled to the full amount deducted, liquidated damages of one hundred percent, prejudgment interest, and his reasonable attorneys' fees and costs under NYLL § 198(1-a).

**FIFTH CAUSE OF ACTION**
**New York Labor Law — Failure to Provide Wage Notices, NYLL § 195(1)**
**(Against the Employer Defendants)**

65 Villanueva repeats and realleges every preceding paragraph.

66 The Employer Defendants never gave Villanueva the written notice of his rate of pay, pay day, and employer that NYLL § 195(1) required at hiring and at each of his raises, in English and in Spanish, his primary language.

67 That failure caused Villanueva concrete harm. Had the Employer Defendants given him the wage notice NYLL § 195(1) requires — stating his rate of pay, how it was computed, and who his employer was — he would have seen that the flat daily rate they paid came to roughly a quarter of the prevailing wage owed a carpenter on public work, and he would have complained and demanded the wages he was owed years before he did, exactly as he did within days of a coworker telling him in November 2025 what the law required. Kept in the dark instead, he lost years of prevailing wages he could otherwise have claimed and recovered. And because the Employer Defendants gave him no notice and no statement of any kind, he was left unable to reconstruct his cash income or to document it accurately for tax purposes. The absence of the required notice was a direct cause of both harms.

68 Villanueva is entitled to statutory damages of fifty dollars per workday up to five thousand dollars, and his reasonable attorneys' fees and costs, under NYLL § 198(1-b).

**SIXTH CAUSE OF ACTION**
**New York Labor Law — Failure to Provide Wage Statements, NYLL § 195(3)**
**(Against the Employer Defendants)**

69 Villanueva repeats and realleges every preceding paragraph.

70 The Employer Defendants never gave Villanueva the statement of dates, hours, rate, gross wages, deductions, and net wages that NYLL § 195(3) required with every payment. For nineteen years his only record was the notation on a cash envelope, and for the final year and the $300 payments there was not even that.

71 That failure caused Villanueva the same concrete harm described in paragraph 65. A wage statement showing his hours, his rate, and the basis for his pay would have revealed to him the overtime he was never paid, the gap between his daily rate and the prevailing wage, and the sums being deducted from his envelope, and he would have acted on that knowledge years earlier; the want of any statement kept each of those wrongs hidden and cost him wages he could have recovered.

72 Villanueva is entitled to statutory damages of two hundred fifty dollars per workday up to five thousand dollars, and his reasonable attorneys' fees and costs, under NYLL § 198(1-d).

**SEVENTH CAUSE OF ACTION**
**Fair Labor Standards Act — Retaliation, 29 U.S.C. § 215(a)(3)**
**(Against the Employer Defendants)**

73 Villanueva repeats and realleges every preceding paragraph.

74 When Villanueva told Gil that wages were owed to Cuevas and to him and his coworkers, asked whether they would be left with nothing, and said they would sue if they were pushed aside, he made a complaint sufficiently clear and detailed that a reasonable employer would understand it as an assertion of rights under the FLSA. Gil understood it as such: he promised them something after the case, told them not to answer calls and to call the employment a friendship, and assured Villanueva it would not come to a lawsuit. Villanueva was also a witness to the practices challenged in the Cuevas Action, an FLSA proceeding then pending in this Court, and was about to testify in it within the meaning of 29 U.S.C. § 215(a)(3). Gil's instruction that Villanueva does not answer if anyone called and describe his employment as a friendship if anyone asked was an effort to keep him from cooperating with or testifying in that proceeding and would deter a reasonable employee from doing so.

75 The Employer Defendants thereafter discharged Villanueva because of that protected activity, on the pretext that there was no more work, in violation of 29 U.S.C. § 215(a)(3). As a result, Villanueva lost his wages and benefits and suffered anxiety and emotional distress; since the discharge he has stayed away from the Employer Defendants' warehouse for fear of being seen.

76 Villanueva is entitled to lost wages, an equal amount as liquidated damages, compensatory damages including for his emotional distress, reinstatement or front pay, and his reasonable attorneys' fees and costs under 29 U.S.C. § 216(b).

**EIGHTH CAUSE OF ACTION**
**New York Labor Law — Retaliation, NYLL § 215**
**(Against the Employer Defendants)**

77 Villanueva repeats and realleges every preceding paragraph.

78 Villanueva's complaint to Gil that the Employer Defendants had not paid him and his coworkers the wages they were owed, and that they would sue to recover them, was a complaint protected by NYLL § 215(1)(a).

79 The Employer Defendants, and Gil and Dalton individually as owners and officers who participated, retaliated by instructing him not to speak with anyone about the Cuevas Action, by instructing him to misdescribe his employment as a friendship, and by discharging him on a false stated reason.

80 Villanueva is entitled to reinstatement or front pay, lost compensation, liquidated damages of up to twenty thousand dollars, compensatory damages including for his emotional distress, and his reasonable attorneys' fees and costs under NYLL § 215(2).

**NINTH CAUSE OF ACTION**
**Quantum Meruit (in the alternative to the Third Cause of Action)**
**(Against the Employer Defendants)**

81 Villanueva repeats and realleges every preceding paragraph.

82 Villanueva performed skilled carpentry, construction, and lead shielding services in good faith at the Employer Defendants' request on the Public Works Projects, expecting to be paid their reasonable value, and the Employer Defendants accepted those services and used them to perform contracts on which public agencies and general contractors paid them.

83 The reasonable value of those services was the prevailing rate of wages and supplements for a carpenter on public work in New York City. The Employer Defendants are liable in quantum meruit for the difference between that reasonable value and what they actually paid Villanueva, in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**Unjust Enrichment (in the alternative to the Third Cause of Action)**
**(Against the Employer Defendants)**

84 Villanueva repeats and realleges every preceding paragraph.

85 The Employer Defendants were enriched at Villanueva's expense by billing for his labor on the Public Works Projects at the prevailing rate, paying him a fraction of it, and keeping the difference, and it is against equity and good conscience to let them retain wages and supplements paid to them for his labor that the law required them to pass on to him.

86 Villanueva is entitled to recover the amount of that enrichment, in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**
**New York City Earned Safe and Sick Time Act, N.Y.C. Admin. Code § 20-911 et seq.**
**(Against the Employer Defendants)**

87 Villanueva repeats and realleges every preceding paragraph.

88 The Employer Defendants were employers, and Villanueva an employee who worked more than eighty hours a calendar year in New York City, within the meaning of N.Y.C. Admin. Code § 20-912. They were required to notify him of his right to safe and sick time, permit him to accrue it at one hour for every thirty worked, permit him to use it for medical care, and pay him for it. They did none of these things and docked his pay when he attended medical appointments.

89 Villanueva is entitled to the pay he lost, statutory damages, and his reasonable attorneys' fees and costs under N.Y.C. Admin. Code § 20-924.

**TWELFTH CAUSE OF ACTION**
**Breach of Public Works Contracts — Third-Party Beneficiary**
**(Against the General Contractor Defendants)**

90 Villanueva repeats and realleges every preceding paragraph.

91 Each General Contractor Defendant was party to a public works contract for one or more of the Public Works Projects and engaged Premier or Tristar as a subcontractor. Each such contract contained, by operation of Article I, § 17 and NYLL § 220(3)(a), the promise described in paragraph 56, which Villanueva may enforce against the General Contractor Defendants as a third-party beneficiary, and each General Contractor Defendant breached it by failing to ensure that Villanueva was paid the prevailing rate and supplements.

92 Villanueva has been damaged in an amount to be determined at trial, with interest, liquidated damages, and his reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

Villanueva respectfully requests judgment against Defendants as follows:

a) Against the Employer Defendants, the unpaid prevailing wages and supplements owed for the Public Works Projects, the unpaid overtime owed under the FLSA and the NYLL, and the amounts unlawfully deducted from his wages, each with liquidated damages as provided by 29 U.S.C. § 216(b) and NYLL §§ 198(1-a) and 663;

b) Against the Employer Defendants, statutory damages of five thousand dollars under NYLL § 198(1-b) and five thousand dollars under NYLL § 198(1-d);

c) Against the Employer Defendants, lost wages, liquidated damages, compensatory damages including for emotional distress, and reinstatement or front pay for his retaliatory discharge under 29 U.S.C. § 216(b) and NYLL § 215(2);

d) Against the Employer Defendants, in the alternative, damages in quantum meruit or for unjust enrichment;

e) Against the Employer Defendants, lost pay and statutory damages under N.Y.C. Admin. Code § 20-924;

f) Against the General Contractor Defendants, the unpaid prevailing wages and supplements owed for the Public Works Projects, with liquidated damages;

g) Prejudgment and post-judgment interest;

h) Reasonable attorneys' fees and costs under 29 U.S.C. § 216(b), NYLL §§ 198, 215, and 663, and N.Y.C. Admin. Code § 20-924; and

i) Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Villanueva demands a trial by jury on all issues so triable.

Dated: September 22, 2026
New York, New York

GEOFFREY KALENDER, PC

Geoffrey Kalender
447 Broadway, 2nd Floor
New York, New York 10013
(929) 489-0636
gk@employmentlawgk.com

THE LAW OFFICES OF JACOB ARONAUER
*By: /s/ Jacob Aronauer*
Jacob Aronauer
250 Broadway, Suite 600
New York, New York 10007
(212) 323-6980
jaronauer@aronauerlaw.com

*Attorneys for Plaintiff Francisco Villanueva*